**Electronically Filed
Supreme Court
SCWC-23-0000185
17-OCT-2024
08:04 AM
Dkt. 21 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellant,

vs.

RANDALL HOFFMAN,
Petitioner/Defendant-Appellee.

_____

SCWC-23-0000185

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-23-0000185; CASE NO. 5CPC-21-0000264)

OCTOBER 17, 2024

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, and DEVENS, JJ.

OPINION OF THE COURT BY McKENNA, J.

**I.   Introduction**

This case presents the issue of whether a defendant's un-Mirandized statements made in response to a police officer's words "normally attendant to arrest and custody" are admissible even when the officer's statements "were reasonably likely to lead to an incriminating response," thus constituting

"interrogation" under Article I, Section 10 of the Hawai'i State Constitution.  The answer is no.

Officer Warren Tavares ("Officer Tavares") of the Hawai'i State Department of Land and Natural Resources Division of Conservation and Resources Enforcement ("DLNR DOCARE") observed Randall Hoffman ("Hoffman") dumping green waste out of a large trailer stopped on a Kaua'i roadside.  After some verbal exchanges and a scuffle, Hoffman was arrested and charged.

Before trial, the state filed a motion to determine the voluntariness of statements made by Hoffman to Officer Tavares during their encounter.[1]  At the hearing on the motion, Officer Tavares testified that he had probable cause to arrest Hoffman from the moment he arrived at the scene, that Hoffman was not free to leave, but that he did not Mirandize Hoffman at any

_____

[1]     Hawai'i Revised Statutes § 621-26 (2016) provides:

> **Confessions, when admissible.**  No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made.

As we explained in State v. Naititi:

> Although orders suppressing evidence typically result from motions to suppress filed by defendants, trial courts are authorized to enter such orders when the admissibility of a confession is at issue under HRS § 621-26.  Pursuant to HRS § 621-26, the trial court *must* make a determination of the voluntariness of a defendant's statements, and the failure to do so constitutes reversible error.

104 Hawai'i 224, 233, 87 P.3d 893, 902 (2004) (cleaned up).

point.  The circuit court suppressed Hoffman's statements in their entirety.[2]

The State appealed.  The State argued Hoffman's statements were made in response to Officer Tavares's statements or actions "normally attendant to arrest and custody" under Hawai'i Revised Statutes ("HRS") § 803-6 (2014)[3] and therefore not "interrogation."  The Intermediate Court of Appeals ("ICA") issued a summary disposition order ("SDO") affirming in part and vacating in part the circuit court's order.  The ICA ruled that certain of Hoffman's statements made to Officer Tavares's statements were in response to statements "normally attendant to arrest and custody" that therefore did not constitute "interrogation."

On certiorari, Hoffman presents a single question: "Did the [ICA] gravely err when it ruled that an officer's conduct and statements 'normally attendant to arrest and custody' could not arise to an interrogation triggering Miranda warnings?"

---

[2]    The circuit court also excluded Hoffman's apology to Tavares for a separate reason: it had not been provided to the defense by the discovery deadline.  Neither party disputed the inadmissibility of Hoffman's apology, so it will not be further discussed.

[3]    HRS § 803-6 provides in relevant part:

> **Arrest, how made.**  (a)  At or before the time of making an arrest, the person shall declare that the person is an officer of justice, if such is the case.  If . . . the person makes the arrest without warrant in any of the cases in which it is authorized by law, the person should give the party arrested clearly to understand for what cause the person undertakes to make the arrest. . . .

Under Article I, Section 10 of the Hawaiʻi Constitution, a statement made by a defendant under "custodial interrogation" without a Miranda warning must be suppressed as unconstitutionally elicited.  State v. Hewitt, 153 Hawaiʻi 33, 43, 526 P.3d 558, 568 (2023).  "Custody" is not at issue as the State concedes Hoffman was in custody during the entire encounter and was not free to leave.  At issue is whether Hoffman's statements were made in response to "interrogation."

We hold that for Article I, Section 10 purposes, the ultimate inquiry is whether a law enforcement officer knew or should have known that their words or conduct were reasonably likely to elicit an incriminating response from the defendant, even though the words and conduct might also be "normally attendant to arrest and custody."  See, e.g., State v. Skapinok, 151 Hawaiʻi 170, 173, 510 P.3d 599, 602 (2022) ("There is no per se exception under the Hawaiʻi Constitution for questions 'necessarily "attendant to" [a] legitimate police procedure.'")

As explained below, we hold that some, but not all, of Hoffman's responses were made in response to words or conduct by Officer Tavares that were reasonably likely to lead to an incriminating response.  Hence, we affirm in part and vacate in part the ICA's judgment on appeal, as well as the circuit court's order suppressing all of Hoffman's statements.

## II. Background

## A. Circuit court proceedings

### 1. Indictment

On December 27, 2021, the State charged Hoffman with one count of assault against a law enforcement officer in the first degree, in violation of HRS § 707-712.5(1)(a)[4]; one count of resisting arrest, in violation of HRS § 710-1026(1)(a)[5]; and one count of criminal littering, in violation of HRS § 708-829.[6]

### 2. State's motion to determine voluntariness of the defendant's statements to police and circuit court's ruling

On March 13, 2023, the State filed a motion to determine the voluntariness of Hoffman's statements to Officer Tavares

---

[4] HRS § 707-712.5 (2014) is titled "Assault against a law enforcement officer in the first degree," and sub-section (1)(a) states, "A person commits the offense of assault against a law enforcement officer in the first degree if the person . . . [i]ntentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty. . . ." Assault against a law enforcement officer in the first degree is a class C felony. HRS § 707-712.5(2). A person convicted of this offense shall be sentenced to (a) an indeterminate term of imprisonment of five years, or (b) five years' probation (with conditions to include a term of imprisonment of not less than 30 days). HRS § 707-712.5(2)(a)&(b).

[5] HRS § 710-1026 (2014) is titled "Resisting arrest," and sub-section (1)(a) states, "A person commits the offense of resisting arrest if the person intentionally prevents a law enforcement officer acting under color of the law enforcement officer's official authority from effecting an arrest by . . . [u]sing or threatening to use physical force against the law enforcement officer or another. . . ." This crime is a misdemeanor. HRS § 710-1026(2).

[6] HRS § 708-829 (2014) is titled "Criminal littering" makes it a petty misdemeanor for a person to knowingly place, throw, or drop litter on any public or private property or waters that is not (a) designated by the department of health or the county for disposal of garbage, (b) a litter receptable, or (c) a littler bag that is later disposed of in a designated disposal site or litter receptacle.

("motion").  Officer Tavares testified at the hearing.  On April 11, 2023, the circuit court filed its findings of fact ("FOF"), conclusions of law ("COL"), and order denying the State's motion.[7]  Only certain conclusions of law are at issue on appeal.  No findings of fact were contested by the parties, so we accept them as true.  Davis v. Bissen, 154 Hawai'i 68, 75, 545 P.3d 557, 564 (2024).  The following findings relate to the statements by Hoffman at issue:

> 11. . . . . Officer Tavares pointed to the sign that prohibited dumping in that area and told Mr. Hoffman that these lands were DLNR [] lands and told Mr. Hoffman to stop throwing green waste from the trailer because it was illegal.
>
> 12. As a result of Officer Tavares' statements, Mr. Hoffman said "Fuck you, I don't give a shit."
>
> 13. Officer Tavares informed Mr. Hoffman that it was illegal and they could get cited and arrested for criminal littering.  Officer Tavares said that the State and multiple agencies worked together recently and spent over $100,000 cleaning up that area.  That it was a high crime area, there was a lot of abandoned cars, there was drug activity going on and the State and multiple agencies worked together and cleaned up that whole area.
>
> 14. Officer Tavares testified that he made those statements to Mr. Hoffman to let him know how much work was done to clean up the area and to show Mr. Hoffman that it was clean.  Officer Tavares testified the purpose of his statements was to get Mr. Hoffman to stop dumping his green waste and to get Mr. Hoffman to pick up the green waste that Mr. Hoffman had already dumped on the ground.
>
> 15.  Mr. Hoffman responded to Officer Tavares by saying "fuck you."
>
> 16. Mr. Hoffman told Officer Tavares that he was turned away from the Hanapepe Refuse Station.  Officer Tavares continued to explain to Mr. Hoffman that he was dumping green waste on the side of the road and that what ever problems he had with the county he needed to take up with

---

[7]    The Honorable Kathleen N.A. Watanabe presided.

the county to see why his trailer was too big.  Officer Tavares told Mr. Hoffman that was not his jurisdiction

. . . .

18.  Mr. Hoffman responded to Officer Tavares by saying "fuck you."

19. Officer Tavares then went into the trailer to handcuff Mr. Hoffman and escorted Mr. Hoffman off of the trailer. Mr. Hoffman was able to move his hands that were handcuffed in the back of him to the front by placing his legs through the opening between the handcuffs and his body.

20. When Officer Tavares went to his vehicle to get a citation book, Mr. Hoffman went back onto the trailer and continued to throw green waste from the trailer onto the ground.

21. Officer Tavares went back into the trailer and Officer Tavares took Mr. Hoffman to the ground to arrest him.  When on the ground Mr. Hoffman fell and Officer Tavares was on top of Mr. Hoffman.  Mr. Hoffman wrapped his legs around Officer Tavares and squeezed causing Officer Tavares pain. As a result, Officer Tavares punched Mr. Hoffman in the facial area.  Mr. Hoffman did not respond to Officer Tavares.

22. Officer Tavares punched Mr. Hoffman a second time in his facial area and Mr. Hoffman said, "okay, I'm done."

Conclusions of law 13, 14, 15, and 18 were contested by the State on appeal:

13. In this case, Officer Tavares engaged in dialogue with the Defendant that he should have known would have been likely to elicit an incriminating response.  Officer Tavares testified that the purpose of Officer Tavares' statements to Mr. Hoffman was to get Mr. Hoffman to do something, pick up his green waste from the ground. Officer Tavares' statements he made to Mr. Hoffman with that purpose went beyond "permissible general on-the-scene questioning."

14. Based on the totality of circumstances, Mr. Hoffman was under custodial interrogation for purposes of Miranda.

15. Because Mr. Hoffman was subjected to custodial interrogation and Officer Tavares did not properly advise Mr. Hoffman of his Miranda rights, the prosecution may not use the above statements in trial.

. . . .

7

18. The State has not met its burden that the evidence and/or statements obtained subsequent to Mr. Hoffman's initial un-Mirandized custodial interrogation were not obtained or induced as a result of the exploitation of a previous illegal act of the police. Therefore, those statements may not be used in trial.

## B. ICA proceedings

The State's opening brief raised the following points of error:[8]

1. The circuit court erred by concluding that Officer Tavares subjected [Hoffman] to "interrogation" when Tavares told him: (1) to stop engaging in the illegal act of criminal littering on DLNR lands (as Tavares pointed to a nearby, official sign prohibiting the dumping of green waste there); and (2) that the State had recently expended substantial resources to clean up the area.

. . . .

2. The circuit court erred by suppressing from evidence the initial statements that [Hoffman] uttered to Officer Tavares.

On March 1, 2024, the ICA filed a SDO affirming in part, and vacating in part, the circuit court's order. State v. Hoffman, No. CAAP-23-0000185, 2024 WL 889206 (Haw. App. Mar. 1, 2024) (SDO).

The ICA agreed with the circuit court that Officer Tavares's statements in FOF 13 that the State had spent $100,000

---

[8]     The State filed its notice of appeal pursuant to HRS § 641-13(7) (2016), which provides:

**By State in criminal cases.** An appeal may be taken by and on behalf of the State from the district or circuit courts to the intermediate appellate court, subject to chapter 602, in all criminal matters, in the following instances:
     . . . .
     (7)  From a pretrial order granting a motion for the suppression of evidence, including a confession or admission . . . in which case the appellate court shall give priority to the appeal and the order shall be stayed pending the outcome of the appeal[.]

8

to clean up the Lolokai Street area, a high crime area with many abandoned cars and drug activity, were reasonably likely to elicit an incriminating response from Hoffman.  2024 WL 889206, at *2.  The ICA thus affirmed the circuit court's order excluding Hoffman's response in FOF 16 that he had been turned away from a county refuse station because his trailer was too big.  Id.

The ICA ruled, however, that the remaining statements made by Hoffman to Officer Tavares were not interrogation and were, instead, voluntary utterances made in response to actions or statements normally attendant to arrest and custody.  Id.

First, the ICA indicated that Officer Tavares had to inform Hoffman why he could be arrested, pursuant to HRS § 803-6(a), which states that an arresting officer, among other things, "should give the party arrested clearly to understand for what cause the person undertakes to make the arrest."  2024 WL 889206, at *1.  The ICA characterized Officer Tavares's actions and statements in FOF 11, pointing at the sign prohibiting dumping, telling Hoffman that the lands were DLNR lands, and telling Hoffman to stop throwing green waste, were normally attendant to arrest and custody.  Id.  The ICA concluded that Hoffman's response of "Fuck you, I don't give a shit," in FOF 12, to be "voluntary utterances, not in response to interrogation."  Id.

Second, the ICA also characterized Officer Tavares's statement in FOF 13 that Hoffman would be arrested if he continued to dump green waste as a statement normally attendant to arrest and custody.  Id.  The ICA then ruled Hoffman's response of "Fuck you," in FOF 15, was a voluntary utterance. Id.

Third, the ICA characterized Officer Tavares's statements during the scuffle ("Stop resisting") as "normally attendant to arrest and custody under the facts of this case."  2024 WL 889206, at \*2.  It ruled Hoffman's response ("Okay, I'm done") was "not a response to interrogation."  Id.  The ICA held the circuit court also erred in denying the State's motion as to that statement from Hoffman.  Id.

On April 1, 2024, the ICA issued its judgment on appeal.

## C.   Certiorari proceedings

Hoffman's certiorari application presents a single question: "Did the [ICA] gravely err when it ruled that an officer's conduct and statements 'normally attendant to arrest and custody' could not arise to an interrogation triggering Miranda warnings?"

## III. Standards of Review

## A.   Motion to suppress

"An appellate court reviews a ruling on a motion to suppress de novo to determine whether the ruling was 'right' or

10

'wrong.'"  Hewitt, 153 Hawaiʻi at 40, 526 P.3d at 565 (citations omitted).

## B.    Constitutional issues

"Questions of constitutional law are reviewed under the right/wrong standard."  State v. Borge, 152 Hawaiʻi 458, 464, 526 P.3d 435, 441 (2023) (citation omitted).

### IV.    Discussion

## A.    Summary of applicable law

The Fifth Amendment to the U.S. Constitution and Article I, Section 10 of the Hawaiʻi Constitution guarantee the right against self-incrimination.  Hewitt, 153 Hawaiʻi at 43, 526 P.3d at 568.  The Fifth Amendment states, "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."  Article I, section 10 of the Hawaiʻi Constitution states, "No person shall . . . be compelled in any criminal case to be a witness against oneself."  "Miranda warnings help safeguard this right."  Hewitt, 153 Hawaiʻi at 43, 526 P.3d at 568.  As a matter of state constitutionalism, this court "provide[s] criminal defendants with greater protection under Hawaiʻi's version of the privilege against self-incrimination . . . than is otherwise ensured by the federal courts under Miranda and its progeny."  Hewitt, 153 Hawaiʻi at 44, 526 P.3d at 569 (citation omitted).

11

Under the Hawai'i Constitution, "[a]bsent <u>Miranda</u> warnings and a valid waiver of them, statements obtained from a person subjected to uncounseled custodial interrogation are inadmissible in a subsequent criminal proceeding brought against that person."  <u>State v. Ah Loo</u>, 94 Hawai'i 207, 210, 10 P.3d 728, 731 (2000).  A "custodial interrogation" consists of

> questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of their freedom of action in any significant way.  In other words, the defendant, objecting to the admissibility of their statement and, thus, seeking to suppress it, must establish that their statement was the result of (1) "interrogation" that occurred while they were (2) "in custody."

<u>Hewitt</u>, 153 Hawai'i at 43, 526 P.3d at 568 (cleaned up).

In this case, no party disputes that Hoffman was in custody when Officer Tavares approached him and started talking to him. What is at issue is whether Tavares's words or conduct directed at Hoffman constituted interrogation.

In <u>State v. Paahana</u>, for purposes of the Hawai'i Constitution, this court adopted the interrogation test in <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980): "In determining whether an officer's questions constitute interrogation, the test is whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from the defendant."  66 Haw. 499, 503, 666 P.2d 592, 595-96 (1983).

In <u>State v. Ketchum</u>, 97 Hawai'i 107, 119-20, 34 P.3d 1006, 1018-19 (2001), this court declined, as a matter of state

12

constitutional law, to recognize a federal "carve out" to the Innis interrogation inquiry: the "routine booking question exception."  "Routine booking questions" "elicit[] general biographical data necessary for purposes of booking and pretrial services."  Id.  This court noted that, "in the vast majority of cases," routine booking questions are not "reasonably likely to elicit incriminating responses."  Id.

In Ketchum, however, the police asked a suspect (Ketchum) a would-be "routine booking question" about his residence address. 97 Hawai'i at 112, 34 P.3d at 1011.  We held that the "routine booking question" was nevertheless reasonably likely to elicit an incriminating response under the circumstances; therefore, Ketchum was interrogated for Miranda purposes.  97 Hawai'i at 127, 34 P.3d at 1026.  This was because the police raided a home pursuant to a search warrant and located Ketchum, drugs, and the known occupant of the home in the bedroom.  97 Hawai'i at 112, 34 P.3d at 1011.  Although the first police officer asking Ketchum for his residence address testified that "obtaining such personal information was 'normal procedure,'" the police officer also acknowledged that "establishing Ketchum's address as the same as that where drug contraband was found would assist in prosecuting him for constructive possession of any drug contraband subsequently discovered in the residence."  Id.  We also held the residence address question posed by other police

13

officers constituted interrogation.  97 Hawai'i at 128-29, 34 P.3d at 1027-28.

In declining on state constitutional grounds to recognize the "routine booking question" exception to Innis's interrogation test, we stated:

> Thus, to the extent that, under article I, section 10, the ultimate question regarding "interrogation" is whether the questioning officer knew or reasonably should have known that his or her question was likely to elicit an incriminating response, the fact that a question is in the nature of a "routine booking question" is merely one consideration among many relevant to an assessment of the totality of the circumstances.  In other words, the "routine booking question exception" does no more than recognize that not every "express question" constitutes "interrogation."

Ketchum, 97 Hawai'i at 120, 34 P.3d at 1019 (citations and footnote omitted).

State v. Kazanas, 138 Hawai'i 23, 35, 375 P.3d 1261, 1273 (2016) later clarified that "determining whether 'interrogation' has taken place is not measured by the 'totality of the circumstances,' as Ketchum held; rather, 'interrogation' occurs when police know or should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect, as Innis held."  Nevertheless, Kazanas reaffirmed that the "touchstone in analyzing whether 'interrogation' has taken place is whether the police officer 'should have known that [their] words and actions were reasonably likely to elicit an incriminating response from the defendant.'"  138 Hawai'i at 38,

375 P.3d at 1276 (citing Paahana, 66 Haw. at 503, 666 P.2d at 595-96 (citing Innis, 446 U.S. at 301)) (emphasis added).

The use of the Paahana/Innis "interrogation" test continued through this court's decision in State v. Trinque, where we stated, "'interrogation' under [our state] Miranda [rule] refers to (1) any words, actions, or practice on the part of the police, not only express questioning, (2) other than those normally attendant to arrest and custody, and (3) that the police should know is reasonably likely to invoke an incriminating response." 140 Hawai'i 269, 277, 400 P.3d 470, 478 (2017). In Trinque, police officers received information that marijuana was growing in a 25-acre pasture. 140 Hawai'i at 272, 400 P.3d at 473. Police conducted nighttime surveillance of the pasture and encountered Trinque and another individual. Id.

One of the police officers identified himself as Lieutenant Rosa and informed Trinque that he knew of Trinque because he had assisted Trinque's daughter with her case when she was worried about people who might have intended to assault Trinque. 140 Hawai'i at 273, 273 n.2, 400 P.3d at 474, 474 n.2. Lieutenant Rosa told Trinque "he would not lie to him," "he would not 'jerk his chain,'" and that "he would be completely honest with him." 140 Hawai'i at 273, 400 P.3d at 474. Lieutenant Rosa then advised Trinque not to make any statements until they got back to Lihue and Trinque could be advised of his rights. Id.

Trinque had not been advised of his Miranda rights at this time. Id. Trinque then stated, "What for?  You caught us red handed, there's nothing left to say, times are hard and we needed the money."  Id.  The circuit court suppressed this statement, among others, and the State appealed.  140 Hawai'i at 275, 400 P.3d at 476.  This court affirmed the circuit court, holding that Lieutenant Rosa's statements elicited the statement from Trinque that was "the product of pre-Miranda custodial interrogation" and therefore inadmissible.  140 Hawai'i at 284, 400 P.3d at 485.

As to Lieutenant Rosa's statements, the Trinque court held, "While Lt. Rosa's introduction of himself to Trinque as a police officer may have been normal procedure that typically attends arrests, all of the other words and actions that Lt. Rosa directed to Trinque cannot be characterized as anything other than an attempt to erode Trinque's guard so that Trinque would freely talk in a manner that would incriminate himself."  140 Hawai'i at 278, 400 P.3d at 479 (emphases added).  Thus, contrary to the State's argument, even if a police officer's statement is "normally attendant to arrest and custody," Article I, Section 10 still requires a court to analyze whether the statement was reasonably likely to elicit an incriminating response to determine whether a defendant was interrogated for Miranda purposes.  There is no "carve out" or "exception" to the

interrogation inquiry for statements "normally attendant to arrest and custody."

Finally, Skapinok puts to rest any argument that police statements "normally attendant to arrest and custody" are an actual exception to the "interrogation" test. In that case, we held that "medical rule-out questions" that police ask during traffic stops on suspicion of operating a vehicle under the influence of an intoxicant ("OVUII") are not exempted from the Miranda interrogation inquiry. 151 Hawai'i at 172, 510 P.3d at 601. More to the point, this court held,

> There is no per se exception under the Hawai'i Constitution for questions "necessarily 'attendant to' [a] legitimate police procedure." To avoid suppression for want of Miranda warnings, such questions must pass muster under our well-established interrogation test: "whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from the defendant."

151 Hawai'i at 173, 510 P.3d at 602 (citing Paahana, 66 Haw. at 503, 666 P.2d at 595-96).

In Skapinok, a police officer pulled over a suspect (Skapinok) on suspicion of reckless driving, then developed a reasonable suspicion that Skapinok was committing OVUII as well. 151 Hawai'i at 173, 510 P.3d at 602. A police corporal arrived and asked Skapinok the "medical rule-out questions" prior to administering standard field sobriety tests:

> i. Do you have any physical defects or speech impediments?
> ii. Are you taking any medications?
> iii. Are you under the care of a doctor or dentist for anything?

17

>iv.  Are you under the care of an eye doctor?
>v.  Do you have an artificial or glass eye?
>vi.  Are you epileptic or diabetic?
>vii.  Are you blind in either eye?

151 Hawai'i at 173-74, 177, 510 P.3d at 602-03, 605. Neither police officer advised Skapinok of her Miranda rights at the scene. 151 Hawai'i at 174, 510 P.3d at 603. The district court suppressed all of Skapinok's answers to these questions as violative of her Hawai'i constitutional right against self-incrimination, and the State appealed. 151 Hawai'i at 177-78, 510 P.3d at 606-07.

The ICA held that the medical rule-out questions were reasonably likely to elicit an incriminating response and, therefore, constituted interrogation. 151 Hawai'i at 178, 510 P.3d at 607. This court affirmed that conclusion. 151 Hawai'i at 179, 510 P.3d at 608. Rather than alter the test set forth in Trinque (as the State contends), this court cited it: "'[I]nterrogation under Miranda refers to (1) any words, actions, or practice on the part of the police, not only express questioning, (2) other than those normally attendant to arrest and custody, and (3) that the police should know is reasonably likely to invoke an incriminating response." 151 Hawai'i at 180, 510 P.3d at 609 (citing Trinque, 140 Hawai'i at 277, 400 P.3d at 478).

Skapinok clarified that there is no absolute carve-out for police procedures normally attendant to arrest and custody. Rather, Skapinok articulated that the second Trinque factor is still subject to an analysis under the third Trinque factor. Specifically, this court noted, "While we have explicitly recognized the 'attendant to arrest and custody' carve-out to the definition of 'interrogation,' Hawai'i law points against eliminating the 'incriminating response' inquiry even when the police ask questions 'attendant to' a routine, legitimate procedure." Skapinok, 151 Hawai'i at 182, 510 P.3d at 611 (citing Trinque, 140 Hawai'i at 277, 400 P.3d at 478). This court elaborated, "[W]e see no reason to treat questions 'attendant to' police procedures differently than 'booking questions' under the Hawai'i Constitution – the inquiry in both circumstances is whether the question is reasonably likely to elicit an incriminating response." 151 Hawai'i at 183, 510 P.3d at 612. "In other words, being attendant to a police procedure, standing alone, does not obviate the need to examine whether the officer knew or should have known that the questions were reasonably likely to elicit an incriminating response." Id.

The State finds significance in the difference in Skapinok's phraseology between questions "'attendant to' police procedures" and questions "normally attendant to arrest and custody" to argue that Skapinok did not, in fact, hold that

questions "normally attendant to arrest and custody" are nevertheless subject to an analysis into whether the police officer knew or should have known that their words or conduct would be reasonable likely to elicit an incriminating response. In looking at the root of the phrase "attendant to police procedures" that Skapinok drew from Pennsylvania v. Muniz, 496 U.S. 582 (1990), it is clear that the United States Supreme Court was interpreting Innis's "normally attendant to arrest and custody" concept.  The Muniz court used the phrase "attendant to" a "legitimate police procedure" for this concept and cited to South Dakota v. Neville, 459 U.S. 553, 564 n.15 (1983).  496 U.S. at 605.  Footnote 15 in Neville, in turn, cited directly to Innis for the "normally attendant to arrest and custody" prong of the interrogation test.  459 U.S. at 564 n.15.  Therefore, as Hoffman argues, an unbroken chain of Hawaiʻi appellate precedent holds that, under the Hawaiʻi Constitution, police questions "normally attendant to arrest and custody" are still subject to the touchstone inquiry into whether those questions were reasonably likely to elicit an incriminating response.

B.   **Application of law to each of Hoffman's remaining statements at issue**

The State did not file an application for certiorari, so the ICA's affirmance of the circuit court's suppression of Hoffman's response in FOF 16 that he had been turned away from a

20

county refuse station because his trailer was too big is not at issue.  We now apply the principles of law above to each of the remaining statements at issue.

### 1.    FOFs 11 & 12: first "Fuck you, I don't give a shit"

Officer Tavares testified that when he initially engaged Hoffman by pointing to the littering sign and stated that what Hoffman was doing was illegal, Hoffman responded, "Fuck you, I don't give a shit."  The ICA ruled that Officer Tavares's statement was normally attendant to arrest and custody and that Hoffman's initial statement was a voluntary utterance.  The ICA erred in two ways: (1) factually, because Officer Tavares's own uncontroverted testimony was that he was not in the process of arresting Hoffman; and (2) legally, because it applied the wrong standard.  As noted, Officer Tavares's words and conduct must be analyzed for whether they were reasonably likely to elicit an incriminating response.

Despite the ICA's error, Officer Tavares pointing to the sign and informing Hoffman that what he was doing was illegal did not constitute words or conduct reasonably likely to elicit an incriminating response.  "Criminal littering" under HRS § 708-829 requires the State to prove that a defendant acted "knowingly."  It is not reasonably likely that a person being informed that he was dumping items in a prohibited area would admit to such a state of mind by making an incriminating

21

statement like "Fuck you, I don't give a shit."  Thus, although the ICA applied the incorrect legal standard, we hold that Hoffman's first statement was not in response to words or conduct of Officer Tavares that was likely to elicit an incriminating response.

### 2.    FOFs 13-15, second "fuck you"[9]

The ICA affirmed the circuit court's ruling that Officer Tavares's statements in FOF 13 were reasonably likely to elicit an incriminating response from Hoffman and that, therefore, Hoffman's response in FOF 16, that he had been turned away from a county refuse station, was properly suppressed.  Yet, because Officer Tavares had said what Hoffman was doing was illegal and that he could get cited and arrested for criminal littering at the beginning of this statement in FOF 13, the ICA determined that Hoffmans' second "fuck you," which preceded his statement in FOF 16 that the ICA ruled was properly suppressed, was in response to a statement normally attendant to arrest and also a voluntary utterance.

First, Officer Taveres's statement that what Hoffman was doing was illegal and that he could get cited and arrested was not a statement normally attendant to arrest as Officer Tavares was not placing Hoffman under arrest and had no intention of

---

[9]     The ICA refers to this as the third "fuck you."  The ICA SDO says it was supplementing the circuit court's FOFs with Officer Tavares's testimony. Hoffman, 2024 WL 889206, at *1.  But the unchallenged FOFs control.

22

arresting Hoffman at that point in time.  In any event, the ICA again applied the wrong standard; the proper standard is whether the officer's words were reasonably likely to lead to an incriminating response.  Just as Hoffman's response that followed in FOF 16 was in response to statements from Officer Tavares in FOF 13 likely to elicit an incriminating response, so was his "fuck you" in FOF 15 that began the explanation the ICA determined was properly suppressed in FOF 16, especially after he had already incriminated himself with the first "Fuck you, I don't give a shit."

### 3.    FOFs 16 & 18, third "fuck you"[10]

The ICA does not specifically refer to this third "fuck you."  Its ruling does not vacate the circuit court's ruling regarding FOF 16 and 18.  In any event, Officer Tavares's statements in FOF 16 were also reasonably likely to lead to an incriminating response such that Hoffman's statement in FOF 18 should be suppressed.

### 4.    FOFs 21-22, "okay I'm done"

The ICA determined Officer Tavares's actions in effectuating the arrest and statement "stop resisting" during the scuffle were normally attendant to arrest and custody and that Hoffman's response, "okay, I'm done" was not in response to

---

[10]    See supra note 9.

interrogation. As explained above, HRS § 803-6 does not alter the "interrogation" test, and to avoid suppression for want of <u>Miranda</u> warnings, statements and actions are analyzed for whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from the defendant.

Officer's Tavares's words were a command to Hoffman to "stop resisting" and to stop exerting physical force against the officer, and were not words reasonably likely to elicit an incriminating response. Thus, the ICA did not err by overruling the circuit court's suppression of this statement.

## V. Conclusion

For these reasons, we vacate the ICA April 1, 2024 judgment on appeal as well as the circuit court's April 11, 2023 "Findings of Fact, Conclusions of Law, and Order Denying State of Hawaii's Motion to Determine Voluntariness of Defendant's Statements to Police," and remand this case to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Benjamin E. Lowenthal<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| David M. Seaver<br>(Tracy Murakami,<br>with him on the briefs),<br>for respondent | /s/ Todd W. Eddins |
| | /s/ Lisa M. Ginoza |
| | /s/ Vladimir P. Devens |

